Murphy, J.
The plaintiffs, Twin Fires Investment, LLC (“Twin Fires”), and Stephens W. Dunne (“Dunne”),. commenced this action against defendants Morgan Stanley Dean Witter & Co. (“MSDW”) and Andrew Finch (“Finch"), to recover damages arising out of a failed securities transaction. The defendants now move for summary judgment on all counts of the Complaint. After review of the record, and in consideration of arguments and submissions of counsel, the defendants’ Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.
BACKGROUND
Twin Fires is a limited liability company created in February 2000, for the sole and specific purpose of investing in the initial public offering (“IPO”) of webMethods, Inc. (“webMethods”). During a conversation in January 2000, Finch, a stockbroker at MSDW, orally offered to sell and Dunne, as a principal of what was to become Twin Fires and on its behalf, agreed to buy 75,000 shares of webMethods stock in the IPO. Finch repeated this commitment in several subsequent conversations.
As stated, in furtherance of these conversations, Dunne and Ricky J. Dlugasch (“Dlugasch”) established Twin Fires. In early February 2000, Twin Fires opened an account at Dean Witter. Meanwhile, Dunne was engaged in the active solicitation of outside investors to join Twin Fires.
During this period, Dunne received a preliminary prospectus on webMethods and a press release stating that the security could not be sold until the registration statement (the “Statement”) was filed with the Securities and Exchange Commission. The Statement became effective on February 10, 2000. The stock was thereafter offered to the public on February 11, 2000, and closed that day at $212 a share, from an initial offering price of $35 a share.
Twin Fires and Dunne did not receive shares in the webMethods IPO. The plaintiffs subsequently brought this action seeking damages arising from these events.
DISCUSSION
I. Summary Judgment Standard
This Court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. See Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P.56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. See Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); see also Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The nonmoving party cannot defeat the motion for summary judgment by resting on its pleadings or mere assertions of disputed facts. See also LaLonde v. Eissner, 405 Mass. 207, 209 (1989). “One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims and defenses.” Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); see also Kourouvacilis, 410 Mass. at 712.
II. Breach of Contract Claim
The defendants ask this Court to grant summary judgment on the plaintiffs’ claim for breach of contract on grounds of illegality and lack of mutual obligation. The defendants argue that any contract between Finch and Dunne for the sale of unregistered securities is illegal and thus void and unenforceable. The defendants further argue that because the plaintiffs, as purchasers, were never legally bound to purchase the shares, the contract is illusory. In their Reply Memorandum, the defendants shift the focus of their argument. In this filing, the defendants argue that the contract is further unenforceable because the plaintiffs are seeking to ratify a contract which never existed and where the shares were never actually purchased.
Federal securities laws apply to any contract for the purchase or sale of a security. See 15 U.S.C. §§78c(a)( 13), (14). In a recent ruling, the United States Supreme Court interpreted this language to include oral contracts for the sale of securities. See The Wharf (Holdings) Limited v. United International Holdings, Inc., 121 S.Ct. 1776, 1781 (2001). Contrary to the contentions of defendants, the Securities Act of 1933 [the “33 Act”) does not by its terms automatically invalidate sales of unregistered securities in violation of Section 5 thereof. See A.D.M Corp. v. Thomson, 707 F.2d 25, 27 (1st.Cir. 1983); see also 15 U.S.C. §77e(c). Courts have consistently held that a seller cannot set aside his own unlawful contract where the contract’s enforcement does not threaten public policy as manifested in the Act itself. See Thomson, 707 F.2d. at 27.
*659 This is not a case where a prospective buyer has no recourse against a person who offers but does not sell unregistered securities. See, e.g., Pinter v. Dahl, 486 U.S. 622, 644-45 (1988). In the present case, the oral contract between the parties for the purchase of unregistered webMethods shares constitutes a “sale” under the 33 Act. The plaintiffs are holders of contractual rights to purchase securities and are “purchasers” of securities for purposes of the Act. See United International Holdings, Inc., 121 S.Ct. at 1780, citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 751 (1975); see also 15 U.S.C. §78(a)(10). The record in this case, inclusive of deposition transcripts and answers to interrogatories, contains a course of dealing between Dunne and Finch which, for summary judgment purposes, supports both the existence of genuine and material facts with respect to the formation of a binding contract between the parties and with respect to the issue of ratification of any contract which may have been somehow technically invalid prior to the effective date of the Statement. Defendants’ argument, which seeks in essence to parse the course of dealings so as to void a contract consummated prior to the effective date of the Statement, ignores the repetition by Finch to Dunne of the construct and existence of a “deal” for the 75,000 shares on February 11, 2000, when the shares were in fact actively trading on the open market. In fact, Finch is alleged to have stated explicitly that the shares in question had been obtained for the Twin Fires account — a “Dunne Deal,” were the unpardonable pun to be pardoned.
Whether these February 11, 2000 statements by Finch were in the nature of continuing contract creation and formulation or in the nature of receiving Twin Fires’ ratification of its prior commitments is immaterial save perhaps to metaphysicians, against whom there is no continuing prohibition in the exalting of form over substance. What is clear to this Court is that the allowance of summary judgment on the plaintiffs’ breach of contract claim would contravene the declared public policy and raison d’etre of the 33 Act, to wit, the protection of investors. See A.C. Frost & Co. v. Coeur d’Alene Mines Corp., 312 U.S. 38, 43 (1941).
III. Fraud and Negligent Misrepresentation Claim
The defendants argue that any reliance by the plaintiffs on the alleged misrepresentations of Finch was unreasonable and cannot support a claim for fraud and negligent misrepresentation.
The Court first notes that a claim for negligent misrepresentation is usually best left for a jury to consider. See Golber v. BayBank Valley Trust Co., 46 Mass.App.Ct. 256, 257 (1999). After a review of the record, the Court finds no reason to depart from the conventionality that the reasonableness of the plaintiffs’ reliance upon the misrepresentations alleged is properly the province of the jury. None of Finch’s alleged misrepresentations impress this court as extraordinary in normal securities brokerage transactions, and it is unclear on the record whether these alleged misrepresentations are fatally at odds with the language of the prospectus and the press release. Reasonable reliance, vel non, is a juiy question in this case.
IV. Blue Sky Claim
Defendants assert plaintiffs’ so-called “Blue Sky Law” claim fails as a matter of law because Twin Fires never actually purchased securities from Finch and MSDW. Plaintiffs maintain that they have standing to make such a claim because Finch offered to sell them the securities.
Under the “Blue Sky Law,” G.L.c. 110A, §410, “any person who . . . offers or sells a security by means of an untrue statement... is liable to the person buying the security firom him ...” The defendants argue that the Court should construe the statute to mean that prospective buyers, such as the plaintiffs, have no recourse where securities are not ultimately purchased. The plaintiffs contend that no authority supports the defendants’ interpretation, and that the record indicates that at least some securities were purchased.
The Court interprets G.L.c. 110A, §410, once again, a self-declared "investor protection” law, as applicable to the case at bar. No authority to the contrary having been cited by defendants, the Court believes that the penumbra from the umbrella of the statutory language shades those circumstances where misrepresentation in the sale of securities leads to injury to the putative purchaser, even where that injury comes from nonperformance and ajortiori, non-purchase.
V. Breach of Fiduciary Duty Claim
In their motion for summary judgment, the defendants contend that the plaintiffs cannot establish a fiduciary relationship between Finch and Dunne. Both parties point to Patsos v. First Albany Corp. as dispositive on this issue. 433 Mass. 323 (2001). Defendants argue that Finch’s lack of discretionary control over the plaintiffs’ account negates the possibility of a fiduciary relationship between himself and the plaintiffs. In part, Patsos states that “where the account is ‘non-discretionary,’ meaning that the customer makes the investment decisions and the stockbroker merely receives and executes a customer’s orders, the relationship generally does not give rise to general fiduciary duties.” See id. at 331.
A broker’s discretion over trading, however, is only one factor in determining whether a relationship is fiduciary in nature. The scope of a broker’s fiduciary duties is a factual issue that turns on the manner in which investment decisions have been reached and transactions executed for the account. See Patsos, 433 Mass. at 332. The Patsos court, in noting the existence of ambiguities in particular cases as to circumstances giving rise to a “full relation of principal and broker,” offered several factors relevant to this determination. See id.
For non-discretionary accounts, each transaction is viewed singly. See id. at 333. The Patsos factors include an examination of the customer’s investment *660 acumen, any expertise professed by the broker, and the broker’s knowledge of the plaintiffs’ reliance on him. See id. at 334-36. The Patsos Court considered these factors and reversed summary judgment for a broker who did not possess discretion over his customer’s account. See id. at 336.
Moreover, in a pre-Patsos case, the Supreme Judicial Court held that a fiduciary relationship came into existence where a stockbroker approached an investor, offered to serve as his agent in a purchase of shares in a company, and represented that he was in a unique position to negotiate the purchase. See Berenson v. Nirenstein, 326 Mass. 285, 289 (1950). Similar to Berenson, plaintiffs allege that Finch approached Dunne with the IPO opportunity, offered to serve as his agent in the purchase of the IPO shares, and informed Dunne that as the lead broker on the IPO, and in personal control of hundreds of thousands of shares, he was in a unique position to insure performance. Plaintiffs have further alleged that Dunne relied on Finch’s offer by soliciting investors, forming a limited liability company to handle the investment, and deposited money in an account with the defendants.
Based upon all favorable inferences to be drawn from the facts on record, a jury could be reasonably justified in finding the existence of a full principal and broker relationship, and thus a fiduciary relationship, between Finch and the plaintiffs. See Patsos, 433 Mass. at 331. The application of the Patsos factors and decision on the ultimate issue of the nature of the parties’ relationship is thus the province of the fact finder.
VI. Negligence Claim
In support of summary judgment, the defendants argue that the plaintiffs’ claim of negligence, which seeks damages for economic losses, is barred by the economic loss rule. The rule precludes recovery in negligence for purely economic loss and has been applied in very different circumstances. See Clark v. Rowe, 428 Mass. 339, 342 (1998). Defendants argue that the economic loss rule does not bar an action based upon the negligence of a fiduciary or a professional stockbroker.
The courts of the Commonwealth have not determined whether the.economic loss rule bars an action based upon the alleged negligence of a stockbroker. In Clark, the Supreme Judicial Court held, in part, that the economic loss rule should not be applied to claims of negligence by a fiduciary. See id. (economic loss rule is inapplicable to lawyers). While the decision in Clark considered other factors relevant to the unique character of the attorney-client relationship, the Court stated that the economic loss rule has been applied in circumstances where there is no fiduciary relationship between the parties. See id. (economic loss rule applies where parties are free to bargain concerning allegation of risk, and, more importantly, where there was no fiduciary relationship).
The cases supporting the defendants’ contention that the economic loss rule is applicable are distinguishable on two points. First, the defendants’ Massachusetts cases each lack any allegation of a fiduciary relationship between the parties. See Princeton Capital Finance Co., LLC v. Marketechs, Inc., 1999 WL 1318955, 10 Mass. L. Rptr. 157 (Mass.Super. Feb. 12, 1999) (Connolly, J.) (title certification case), and Graves v. Warner & Stackpole, 1994 WL 879763 (Mass.Super. June 12, 1994) (Spurlock, J.) (contract financing case). The allegation in the case at bar of a fiduciary relationship between Finch and the plaintiffs is insurmountable, at least for summary judgment purposes, to the extension of the economic loss rule to the instant case. The two extra-jurisdictional cases upon which the defendant relies both originate from the State of Florida, which, unlike this Commonweath, strictly and universally applies the economic loss doctrine. See Interstate Securities Corp. v. Hayes Corp., 920 F.2d. 769, 773, 776 (1991) (breach of fiduciary duty claim that only seeks damages for economic loss is barred); McCutcheon v. Kidder, Peabody & Co., Inc., 938 F.Sup. 820, 823 (1996) (economic loss rule applies to securities cases and bars claims of breach of fiduciary duty).
VII. Chapter 93A Claim
The plaintiffs allege that the defendants violated the Massachusetts Consumer Protection Act, G.L.c. 93A. Chapter 93A prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. G.L.c. 93A, §2 (1997). The defendants contend that as plaintiffs’ allegations amount to mere breach of contract, they cannot constitute a G.L.c. 93A violation.
Reiterating, the plaintiffs allege a collage of misrepresentations by Finch in the course of the IPO development beyond a mere failure to provide the allegedly agreed upon shares. As there is undisputedly no issue of the authority of Finch to bind his principal to the consequences of material misrepresentation, those allegations cannot be said to preclude a fact finder’s determination of unfair or deceptive conduct. See Depasquale v. Ogden Suffolk Downs, Inc., 29 Mass.App.Ct. 658, 663 (1990).
VIII. Intentional Interference Claim
Finally, the defendants seek summary judgment on plaintiffs’ asserted intentional interference with advantageous business relationship claim. To successfully demonstrate a claim for the tort of intentional interference with an advantageous business relationship, Dunne must establish that: 1) he had a business relationship with a third party; 2) the defendants knew of the relationship; 3) the defendants intentionally and improperly interfered with the relationship; and 4) he suffered harm as a direct result. See Comey v. Hill, 387 Mass. 11, 19 (1982).
For summary judgment purposes, Dunne has sufficiently demonstrated genuine and material dispute on the first three elements of this “interference” claim. On the fourth and final element, Dunne’s damages, the Court finds that the record is devoid of evidence *661 that Dunne suffered any legally cognizable harm as a consequence of any of defendants’ actions. Besides mere conjecture as to Dunne’s belief that his reputation was damaged, the only support on the record for the essential damages element is the deposition testimony of one investor. The investor states only that his opinion of Dunne as a potential business associate “may” be affected by the final result of this pending litigation, and, as such, is purely speculative. Summary judgment is thus mandated on this claim. See Flesner, 410 Mass, at 809 (negation of essential element requires summary judgment).
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ Motion for Summary Judgment is GRANTED as to the Count for Intentional Interference with an Advantageous Business Relationship, and is DENIED as to all other Counts of the Complaint.